**Noah Horst**, OSB No. 076089
Email: noah@lmhlegal.com
**Sara Long**, OSB No. 224433
Email: saralong@lmhlegal.com
Levi Merrithew Horst PC
610 SW Alder Street, Suite 415
Portland, Oregon 97205
Telephone: (971) 229-1241
Facsimile: (971) 544-7092

**Attorney for Plaintiff**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| **CYNTHIA BENOIT, as personal representative of the estate of, IKAIKA RYAN CHUNG, deceased**<br><br>Plaintiff,<br><br>vs.<br><br>**ANDREW GRASLEY; MEGAN HEIDT; INTEGRATED MEDICAL SOLUTIONS, LLC, A TEXAS LIMITED LIABILITY COMPANY ALSO KNOWN AS INTEGRATED MEDICAL SOLUTIONS, INC., and the UNITED STATES OF AMERICA**<br><br>Defendants. | Case No. 3:23-cv-00903-JR<br><br>**FIRST AMENDED COMPLAINT**<br><br>**Constitutional Rights Violations: Violation of Eighth Amendment Delay and Denial of Essential Medical Care (*Bivens* Claims)**<br><br>**Wrongful Death and Abuse of Vulnerable Person under Oregon Law and the Federal Tort Claims Act (28 U.S.C.S. § 1346(b)(1))**<br><br>**Jury Trial Demanded** |

## NATURE OF THE CASE

1.      This action is filed by Plaintiff under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 29 U.S.C. § 794 for acts committed by individual federal employees at Federal Correctional Institute Sheridan ("FCI Sheridan"), which

FIRST AMENDED COMPLAINT - 1
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

caused the suffering and death of Ikaika Ryan Chung, on or about August 12, 2021. Mr. Chung had been in the custody of the federal Bureau of Prisons for several years at the time of his death. Mr. Chung had an underlying Hepatitis C infection and had developed liver cirrhosis, which rendered him a more vulnerable prisoner. Defendants refused to treat his underlying Hepatitis C, and also refused to treat his cellulitis which caused him brutal and inhumane suffering, and eventually death. Mr. Chung and other inmates begged the defendants to treat his worsening infection but left untreated, Mr. Chung died of complications resulting from an easily treatable and obvious skin infection of his leg. By the time defendants allowed Mr. Chung to be transported to the hospital, the infection had progressed to septic shock, necrotizing fasciitis, and multiple organ failure. Doctors who worked to save his life at the hospital noted, "he is young and that is the only hope he has at this point." Mr. Chung died the same day. Defendants did not treat or accommodate Mr. Chung's worsening conditions in the weeks prior. Indeed, the day he died, Defendant Megan Heidt declined an obvious opportunity to treat him, telling other prisoners who begged for her intervention, "he's not going to die today." Mr. Chung did die that day and the defendants issued a press release after his death trying to hide their culpability by suggesting that the cause of death was COVID-19. Defendants failed to provide even the most basic care for Mr. Chung and their deliberate indifference and callous denial of essential, basic, and obvious medical care ultimately killed him. Ikaika Ryan Chung was a beloved father and son, whose life, companionship, and friendship was irreplaceable and precious to his family and friends.

**JURISDICTION AND VENUE**

2.      This court has jurisdiction over the subject matter under 28 U.S.C. § 1346(b)(1); 28 U.S.C. 1331; and *Carlson v. Green*, 446 U.S. 14 (1980).

FIRST AMENDED COMPLAINT - 2
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

3.      Venue is proper within the District of Oregon pursuant to 28 U.S.C. § 1391(b) because all of the events giving rise to these claims occurred in this judicial district, and all defendants reside in this judicial district.  Specifically, all of the acts and practices alleged herein occurred in Sheridan, Oregon.

4.      Plaintiff exhausted administrative remedies prior to filing the complaint. On or about April 13, 2022, Plaintiff's attorneys mailed the tort claims notice with standard form 95 attached to the Federal Bureau of Prisons via certified mail, return receipt requested. The Bureau of Prisons sent a letter dated April 27, 2022 acknowledging receipt of the tort claims notice. The Bureau of Prisons sent a letter dated October 30, 2023, denying the claim.

5.      Pursuant to Or. Rev. Stat. Ann. § 124.100(6), Plaintiff's attorneys mailed a copy of the complaint to the Oregon Attorney General on February 21, 2024 via certified mail, return receipt requested.

**PARTIES**

6.      Ikaika Ryan Chung died intestate. Mr. Chung was forty-two years old when he died. Mr. Chung is pictured here with his daughter, Kailani Chung.



**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

7.      Cynthia Benoit is Mr. Chung's mother and the personal representative of his estate. She is a resident of California. She brings this lawsuit individually and on behalf of the estate of Ikaika Ryan Chung. Cynthia Benoit seeks to recover all damages available under Oregon and federal law for the wrongful death of her son.

8.      The United States of America is the governing body which includes the Federal Bureau of Prisons ("BOP") and employs all the individually named defendants herein. The BOP contracts with Integrated Medical Solutions to provide certain aspects of BOP inmates' medical care. The individually named employees of the Federal Bureau of Prisons were at all times relevant acting under color of federal law and were "federal agents" for purposes of this litigation. The United States is the proper defendant for purposes of the torts claimed herein.

9.      Defendant Andrew Grasley is a medical doctor employed by the BOP or, in the alternative employed by Integrated Medical Solutions, as a Clinical Director and treating physician at FCI Sheridan. He was directly responsible for the functioning of Sheridan's prison medical services and oversaw Mr. Chung's medical care prior to Mr. Chung's death. He is sued in his individual capacity.

10.      Defendant Megan Heidt is an EMT employed by the BOP or, in the alternative employed by Integrated Medical Solutions, and was on duty in the medical unit on the day of Mr. Chung's death as well as on duty as medical personnel in the weeks and months leading up to Mr. Chung's death as he and other prisoners repeatedly asked for medical care for Mr. Chung's obviously serious infection. She is sued in her individual capacity.

11.      Upon information and belief, Integrated Medical Solutions, LLC ("IMS"), also known as Integrated Medical Solutions, Inc., is a private corporate entity, based in Texas, that is responsible for aiding in the administrating healthcare within Sheridan. Upon information and

belief, the BOP contracts with IMS to carry out its duty of providing healthcare to prisoners in its custody. IMS is responsible for scheduling prisoners for any outside medical appointments or services, acquiring and retaining medical records, and processing claims.

## FACTUAL ALLEGATIONS

### *Overview*

12. FCI Sheridan and Defendants were aware that Mr. Chung had a Hepatitis C diagnosis. When he was in the custody of the Defendants, Mr. Chung in addition had progressing liver cirrhosis and hypertension. Defendant BOP knew about Mr. Chung's medical conditions and housed him at FCI Sheridan in part because of its close proximity to a local trauma center to facilitate his medical care. Mr. Chung had been in federal custody since early 2018. For months prior to his death, Mr. Chung had excess fluid build-up – swelling or "edema" – in both of his legs. Mr. Chung required treatment for the edema in his legs, Hepatitis C, and liver cirrhosis.

13. When Mr. Chung began developing a skin infection in his swollen leg, Defendants failed to treat it. Defendants gave Mr. Chung compression socks. Socks do not treat infections. Defendants refused to give Mr. Chung antibiotics for so long that the skin infection developed into cellulitis and eventually into sepsis, causing organ failure. He was delirious and on the verge of death by the time medical Defendants transported him to the hospital. And yet that same morning, Defendant Heidt callously refused to provide Mr. Chung access to emergent medical care.

14. Defendants were well aware of Mr. Chung's medical condition and progressing illness. Both the medical staff and the correctional officers who worked in the unit could see that Mr. Chung's legs had ballooned up, that his legs were leaking pus and wrapped in gauze, that his cell smelled like decaying flesh, that he was unable to walk, and that he was becoming delirious. In the correctional setting, prisoners generally mind their own business. Mr. Chung's medical condition was so obvious that other prisoners requested medical treatment on his behalf.

FIRST AMENDED COMPLAINT - 5
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

### *Chronology*

15.    FCI Sheridan medical records indicate that Mr. Chung was waiting for years to receive Hepatitis C treatment. Mr. Chung was first diagnosed with Hepatitis in 2007. Chronic infection with Hepatitis C requires treatment to prevent cirrhosis. As early as March 8, 2018, his liver showed signs of cirrhosis, a serious and life-threatening condition causing scarring of the liver and ultimately liver failure. Lab tests (APRI scores) are used to measure the amount of scarring of the liver. Mr. Chung's APRI scores on labs showed rapid progression from 1.4 (3/8/18) to 2.4 (7/30/19) to 4.1 (1/14/20) to 15.5 (2/24/21). The standard of care is to treat Hepatitis C infection for all patients with chronic Hepatitis C, except those patients with a life expectancy of less than one year due to other illnesses. As the scarring of the liver worsens over time, the urgency to treat is greater to prevent liver cancer, liver failure, and death.

16.    Defendants failed to provide that treatment. At an appointment on March 29, 2019 the BOP Doctor Rochelle Nolte at Metropolitan Corrections Center San Diego discussed with Mr. Chung the "criteria for HCV treatment, which he is not currently eligible for given his recent hospitalization to acute detox and his pre-sentence status and uncertainty of whether he will be somewhere long enough to finish a course of treatment with good continuity of care and follow-up." That was before he was transferred to FCI Sheridan.

17.    The standard of care is to treat Mr. Chung's chronic Hepatitis C as soon as he established care (to be housed at a specific facility for at least 3-6 months for continuity of treatment and follow up), had labs completed (ex. Hepatitis C genotyping) and had an ultrasound (ruling out liver cancer). Mr. Chung could have been treated soon after his July 30, 2019, appointment which showed an APRI score of 2.4. At that time, an ultrasound and genotyping could have been done within one to two months and treatment could have been started and possibly completed by the end of 2019.

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

18.     Mr. Chung was transferred to FCI Sheridan in the summer of 2019. Mr. Chung was sentenced on October 21, 2019 to ten years of prison in the custody of the BOP. Even after he was sentenced to a long term of imprisonment and transferred to Sheridan to serve his sentence, Defendants did not begin treating Mr. Chung's Hepatitis C. When Mr. Chung was transferred to FCI Sheridan in the summer of 2019, Defendants were aware that he had highly progressed liver damage from Hepatitis C and were aware that treatment for Hepatitis C was urgently needed.

19.     Mr. Chung had Genotype 3 Hepatitis, which is treated and curable with an eight or twelve-week course of oral medication, depending on the medication regimen chosen. The cure rate is over 90%. Despite the treatability of Mr. Chung's curable Hepatitis infection, FCI Sheridan and Defendants ignored the standard of care and refused to start Mr. Chung on the oral medication regiment required to cure his infection.

20.     When Defendant Grasley finally saw Mr. Chung on January 7, 2020, months after his transfer to Sheridan, Defendant Grasley ordered a liver ultrasound. On January 7, 2020 Defendant Grasley also noted that in July of 2019 Mr. Chung had an APRI score of 2.42, which is indicative of liver cirrhosis, a complication of untreated Hepatitis C. This APRI score made the need for treatment urgent. On January 7, 2020, Dr. Grasley also noted edema, or notable swelling and fluid retention, in Mr. Chung's lower extremities. Edema is one of the complications that can result from untreated Hepatitis C.

21.     Defendant Grasley, as the physician who is responsible of providing oversight of his medical team and ultimately responsible for the medical care the team delivers, failed to follow up to ensure his order for an ultrasound was followed.

22.     Defendant IMS failed to timely schedule Mr. Chung for an ultrasound.

FIRST AMENDED COMPLAINT - 7
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

23.     Mr. Chung's finally received his first liver ultrasound on April 5, 2021, over a year after Defendant Grasley ordered it. The ultrasound showed advanced cirrhosis, or scarring, of the liver.

24.     Even following the liver ultrasound result on April 5, 2021, and following multiple laboratory blood draws in preparation for Hepatitis C treatment, Defendants never started Mr. Chung on Hepatitis C treatment. Hepatitis C treatment would have cured Mr. Chung's chronic infection, could have reversed the liver cirrhosis and would have lowered his risk of death.

25.     When Defendant Andrew Grasley saw Mr. Chung following his ultrasound on April 10, 2021, instead of immediately starting Hepatitis C treatment Defendant Grasley ordered *another ultrasound*, again coded as routine with the target date of November 26, 2021 for "surveillance of Hepatitis C cirrhosis."  While it is appropriate to monitor a patient for liver cancer surveillance, it falls far below the standard of care to continue ordering ultrasounds for a preventable disease while failing to treat the underlying infection, since the treatment could prevent the development of the disease.

26.     Medical records again show worsening edema during the April 30, 2021 visit to the medical unit. Kimberly Cushman noted edema and weight gain on June 21, 2021 but failed to provide an appropriate follow-up plan. Defendant Grasley failed to discuss the need for a follow up plan with Cushman, who he was supposed to be supervising.

27.     The standard of care for a Hepatitis C patient with worsening fluid retention is to provide a comprehensive medical exam and place the patient under close observation or to schedule regular follow up appointments and labs to monitor the patient's response to treatment. Defendants failed to schedule regular follow up appointments and laboratory tests. This is especially concerning because Mr. Chung was known to have compromised liver function due to his longstanding Hepatitis C infection. Full physical examinations were not performed or

FIRST AMENDED COMPLAINT - 8
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

documented, which are required by the standard of care, especially in a chronically ill patient. Patients with chronic conditions and complications should be followed up on with regular visits and placed on a call-out list, which was not done for Mr. Chung.

28. Due to Defendants' failures to provide adequate or effective treatment and follow up for the continued and worsening edema, Mr. Chung had developed a skin infection in his right leg. Skin infection is a known medical complication that can result from edema. These infections are easily treated but if left untreated, can result in life-threatening complications. In Mr. Chung's case Defendants failed to prescribe oral antibiotics, and his infection worsened, caused severe complications, ultimately spread into his bloodstream and organs and led to his death.

29. Mr. Chung continuously complained to Defendants' medical staff and correctional staff about the symptoms in his right leg, including increasing swelling, pain, skin tenderness, lesions, discoloration, and pus but he was not provided with minimally adequate medical treatment for these worsening conditions. Other prisoners noticed Mr. Chung's symptoms as they progressed, and they also complained to medical and correctional staff on Mr. Chung's behalf. Defendants Heidt was observed by other prisoners in the unit while she did cell checks and did not offer any medical help to Mr. Chung, who complained of his swollen, painful leg. When Mr. Chung and other prisoners complained, they were simply told to fill out a request form, which they did repeatedly to no avail.

30. In the weeks preceding his death, Mr. Chung's legs swelled up to twice their regular size, swelling so much that he was unable to walk. The Defendants knew that Mr. Chung's legs were swollen to the point of making him unable to walk, yet the Defendants did not act to accommodate Mr. Chung's developing disability. When Mr. Chung was not able to walk due to rapid increase in swelling, he should have been placed in an infirmary setting for diagnostic evaluation and treatment. The Defendants did not place Mr. Chung in an informatory

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

setting and did not provide Mr. Chung with a mobility device to help him access medical services, the dining hall, or recreation services.

31. The Defendants did not provide Mr. Chung with the minimally adequate and appropriate medical care for his developing edema and resultant bacterial infection, which severely limited his ability to walk, recreate, participate in prison programs, get to the dining hall, and eventually his very ability to think, reason, remember, and process information. Mr. Chung began missing meals due to his inability to walk.

32. The last few weeks of Mr. Chung's life, other prisoners in his housing unit used an extra wheelchair left in the unit from another prisoner to push Mr. Chung around because he was unable to walk.

33. Unable to walk, Mr. Chung was unable to get to the food hall to eat. The Defendants' response was that if Mr. Chung could not walk to the food hall, he would not get to eat. Other prisoners in the unit brought trays of food from the food hall to Mr. Chung, despite the prison officials refusing to order meal delivery to Mr. Chung's cell.

34. The last few weeks of Mr. Chung's life, Mr. Chung's cell smelled like decaying flesh. Mr. Chung became bedridden and was usually just laying down in his cell with his leg propped up on pillows. Other inmates observed that Mr. Chung's extremely swollen legs had spots bursting open with pus leaking out all over his pillows. The Defendants still did not provide Mr. Chung with medical care.

35. About three weeks before his death, Mr. Chung's right leg had blown up to three to four times its normal size. His right leg developed lesions and dark red and purple patches. About one week later, Mr. Chung's left leg also started swelling up. Both legs developed discoloration and lesions.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

36.     Mr. Chung and other prisoners in his unit repeatedly requested medical care for Mr. Chung's swollen and painful legs, however Defendants failed to evaluate and treat Mr. Chung for the infection. Instead, on August 4, 2021, about a week before Mr. Chung's death, Defendant Doctor Andrew Grasley saw Mr. Chung for a medical appointment, and noted the "pitting edema," without measuring the extent of the swelling or coloration. Defendant Grasley ordered routine labs without a follow-up plan of care. Defendant Grasley did not order expedited or emergency lab work or order any scheduled follow up examinations to be done by nursing staff.

37.     On August 4, 2021, Defendant Doctor Grasley also did not note in the medical chart that Mr. Chung's weight had increased dramatically – twelve pounds in six weeks. This severe, rapid weight increase was due to increased fluid retention, a known complication of cirrhosis.

38.     When Defendant Grasley finally saw Mr. Chung again on August 4, 2021, four months after Mr. Chung's liver ultrasound showed that he had cirrhosis, instead of initiating the eight or twelve-week regimen of treatment to cure the Hepatitis C infection, Defendant Grasley noted, "he has a drug sanction, almost ready to start treatment." It is the physician's responsibility to counsel the patient about substance use and its effects on treatment for Hepatitis C and liver disease, offer substance use treatment, and provide education and encouragement to engage in treatment for both substance use disorder and Hepatitis C.

39.     Even though Mr. Chung's fluid retention and leg swelling had not responded to the previous dose of Furosemide and Mr. Chung had underlying liver disease and fluid retention, on August 4, 2021, Defendant Doctor Grasley doubled the dosage of Mr. Chung's Furosemide prescription – from 40 mg to 80 mg – without ordering any follow-up observation or testing to see how Mr. Chung's blood pressure, kidney and liver function and fluid retention would respond. Despite multiple underlying risk factors, including liver disease and fluid retention, and

FIRST AMENDED COMPLAINT - 11
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

indications that Mr. Chung was not responding to the Furosemide, Defendant Grasley did not schedule Mr. Chung for a follow up appointment, put Mr. Chung on a call out list, order any nursing follow up, or order "urgent" lab work to check if the increase in medication was safe and effective.

40. As commonly recognized by medical standards of care and explained above, edema is a risk factor for cellulitis, a treatable bacterial skin infection, which Mr. Chung had developed weeks earlier. Yet, on August 4, 2021, Defendant Doctor Grasley did not conduct a comprehensive physical exam or note any other physical observations other than edema to check for signs of infection (such as redness, warmth, or pain). In doing so, he denied Mr. Chung routine medical care for Mr. Chung's life-threatening condition. Dr. Grasley's actions fell far below the standard of care. Mr. Chung died less than a week later.

41. For the last days of his life, Mr. Chung became cognitively impaired and was having trouble remembering words. Mr. Chung was likely delirious from sepsis. Sepsis-Associated Delirium is a known medical condition caused by complications from untreated bacterial infections. Once his left leg also swelled to three to four times its normal size, his eyes also started leaking. The Defendants still failed to provide Mr. Chung with medical care for these symptoms.

42. About a week before he died, Mr. Chung was sitting outside his cell at a table, attempting to play cards, when his whole body began to shake. Mr. Chung became incoherent as he went into shock. Other prisoners wheeled Mr. Chung back into his cell. Following this incident Mr. Chung was completely bedridden. Defendants still did not provide Mr. Chung with medical care or even a medical appointment documenting this event.

43. On August 12, 2021, the morning of Mr. Chung's death, a correctional officer came to Mr. Chung's door for a cell check. Other prisoners told the correctional officer that Mr. Chung was incoherent and that he needed to see a doctor immediately. The correctional officer called the

FIRST AMENDED COMPLAINT - 12
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

medical unit and told them that Mr. Chung was incoherent and requested him to be allowed to come to the medical unit. Medical unit staff, including Defendant Heidt, responded that Mr. Chung was not allowed to come to medical to receive emergent, life-saving medical care.

44. Later that morning, Defendant EMT-P Megan Heidt went into Mr. Chung's cell, observed Mr. Chung, and said, "*He's not going to die today*." EMT-P Heidt refused to allow Mr. Chung up to the medical unit for immediate evaluation and emergent treatment, again denying him minimally adequate medical care. Shortly after that, another prisoner wheeled Mr. Chung to the medical unit in a wheelchair, with the tacit agreement of the correctional officer staffing Mr. Chung's housing unit at that time.

45. When Mr. Chung arrived at the medical unit, Defendant EMT-P Heidt yelled at Mr. Chung and the other prisoners to leave and refused to provide Mr. Chung with a physical examination. Another medical staff person saw Mr. Chung and immediately knew he needed emergency care. Over defendant Heidt's objections, they called an ambulance after noting his disorientation, trouble breathing, and dangerously low blood pressure and heart rate. According to the chart note by Nurse Practitioner Farrell, Mr. Chung had warmth on his right thigh and upper lower leg and had a lesion on the back of the left leg. He had low blood pressure, low oxygen levels, dangerously low blood sugar levels, dangerously high heart rate and was delirious.

46. Ambulance records show that after EMR arrival, there was a forty-five-minute delay in prison officials allowing EMR access to Mr. Chung to transport him to the emergency room. The BOP officials, medical staff, and IMS staff failed to timely process the emergency request and make Mr. Chung available for immediate transport to the ER.

47. There were four correctional officers who worked full time in Mr. Chung's housing unit. Two of the four correctional officers worked three dayshifts and three nightshifts every week.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

The other two correctional officers worked four dayshifts and four nightshifts. The Correctional Officers knew about Mr. Chung's obvious illness both because they could see and smell it when they made their rounds multiple times an hour and because Mr. Chung and other prisoners repeatedly complained about Mr. Chung's serious medical condition and their fears that Mr. Chung would die without immediate medical treatment. Correctional and medical staff would stop in at Mr. Chung's cell during the weeks while he was bedridden and suffering and refused to do anything to help Mr. Chung. Defendant EMT-P Megan Heidt, Nurse Anderson, and at least two other medical staff employees were observed by other prisoners to stop at Mr. Chung's cell and refuse to help.

48.     Video from Mr. Chung's housing unit, likely show his whole body shaking when he went into shock while attempting to play cards. The surveillance footage from the unit should also show all of the defendant medical and correctional staff who interacted with Mr. Chung on the unit in the weeks leading to his death. Recorded jail calls will show that Mr. Chung complained openly about the inadequate medical care he was receiving. Plaintiff sent the BOP a preservation request for these records shortly after Mr. Chung's death.

49.     By the time FCI Sheridan medical staff or IMS finally called an ambulance to take Mr. Chung to the nearby emergency room, Mr. Chung was suffering acute multiple organ failure.

50.     When Mr. Chung was finally taken by ambulance to Willamette Valley Medical Center, which is just a twenty-minute drive away from FCI Sheridan, medical staff worked tirelessly to try to save his life. Upon arrival to the emergency room, Mr. Chung was immediately intubated and taken to surgery. Hospitalist notes state that Mr. Chung was suffering from "septic shock due to [] necrotizing soft tissue infection of the right thigh causing multiorgan failure. This is superimposed on top of Hep C and hypertension. He now has acute renal failure, acute liver failure,

FIRST AMENDED COMPLAINT - 14
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

respiratory failure, and cardiac failure with the need for pressors. He is currently intubated and has had a central line placed by ER."

51. The hospital immediately started Mr. Chung on IV antibiotics. Such a course of treatment was clearly indicated by universally accepted medical standards of care and Defendants should have started IV antibiotics weeks prior to his death.

52. Surgical notes state that Mr. Chung was transported "urgently to [the] operating room for incision and drainage of the soft tissue infection and what appears to be the right upper thigh [] as the possible cause of his sepsis. He will remain intubated and go to the ICU for resuscitation. He is critically ill and has an extremely high mortality from this." Further hospitalist notes state, "prognosis very grim given he has multiorgan failure," "he is in big trouble and will see if he can survive any of this," "[w]ill check an echo in the am if can survive the night. He is critically ill. *He is young and that is the only hope that he has at this point.*"

53. Mr. Chung did not survive the night. He died from septic shock in the ICU after multiple episodes of cardiac arrest and an emergency procedure to surgically debride necrotic tissue in his right leg. Mr. Chung was merely forty-two years old when he died of complications from a simple, untreated skin infection. His death was the result of an atrocious failure of conscience and all human decency toward an incarcerated human being.

54. The medical examiner determined that Mr. Chung died of "septic shock due to cellulitis of the bilateral lower extremities and probable necrotizing fasciitis of the right lower extremity." The autopsy showed that the tissue on Mr. Chung's right upper thigh was "visibly necrotic" – meaning dead. Cellulitis is a bacterial infection of the skin that can be treated and cured by oral or intravenous antibiotics. If left untreated, cellulitis can result in sepsis and secondary infections including necrotizing fasciitis, both of which are life-threatening conditions. By the time

FIRST AMENDED COMPLAINT - 15
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

of his death, Mr. Chung had both of these complications: necrotizing fasciitis, where the deep soft tissue dies and must be surgically removed, and sepsis, which led to septic shock, which is a severe drop in blood pressure that results in multiple organ failure. Mr. Chung had multiple organ failure at the time of his death in the ICU.

**BOP Policies and Defendants' Responsibilities**

55. Upon information and belief, the United States/BOP and FCI Sheridan contracted with Integrated Medical Solutions to provide comprehensive medical services for FCI Sheridan.

56. Defendant Doctor Andrew Grasley was the Clinical Director of the Sheridan Medical Unit. Defendant Andrew Grasley was also the treating provider for Mr. Chung.

57. Under the U.S. Department of Justice Federal Bureau of Prisons policy on Patient Care 6031.04 (6), as "Clinical Director," Defendant Grasley, had the responsibility to direct the clinical care of all patients at the prison and the responsibility to supervise all the other health care providers in the facility. Defendant Grasley failed to provide Mr. Chung with timely and medically appropriate care, directly leading to Mr. Chung's death. Defendant Grasley knew or reasonably should have known about Mr. Chung's urgent need for medical care both from his own observations and from notes that were taken by his treatment team.

58. Defendant Grasley was the physician responsible for Mr. Chung's care. As such, under BOP policy on Patient Care 6031.04 (12)(a)(1)(a) Defendant Grasley was responsible to "provide clinical oversight for multiple provider teams." 6031.04 (12)(a)(1)(a) states further "[t]he physician, as the licensed provider of the team, is responsible for the care that team delivers. As such, it is the physician's responsibility:

- To consult with the other team members.

- To provide training and mentoring.

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

- To directly evaluate and treat severely ill and medically complex inmates."

59. Among other failures, Defendant Grasley failed to recognize that Mr. Chung's cellulitis (which he was more vulnerable to because of his underlying Hepatitis C infection and cirrhosis) was an "acute or emergent" medical condition. Defendant Grasley failed to recognize that treatment of Mr. Chung's Hepatitis C infection and cellulitis was "medically necessary" and in fact, with continued failure to treat, became "acute or emergent" treatment. Under BOP policy on Patient Care 6031.04 (7)(a) "medically necessary" means "medical conditions that are of an immediate, acute, or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life threatening." Defendant Grasley and the other Defendants, whom he should have appropriately supervised and trained, failed to treat Mr. Chung's cellulitis condition as an acute condition requiring immediate treatment and also failed to treat Mr. Chung's Hepatitis C infection that was an emergent condition requiring medically necessary treatment to prevent loss of function and death.

60. Defendant Grasley consciously disregarded that Mr. Chung's medical condition required medical treatment and follow-up after he saw him on August 4, 2021. Under BOP policy on Patient Care 6031.04 (10) observation would have been necessary at that point if Mr. Chung was not transported to the hospital for immediate administration of IV antibiotics.

61. On August 4, 2021. Defendant Grasley failed to schedule a timely follow up appointment with a member of the patient's provider team to monitor Mr. Chung's still worsening edema. BOP policy on Patient Care 6031.04 (12)(a) and 6031.04 (17)(a) required Dr. Grasley, as the provider to note the need to schedule a follow-up appointment, and make sure a follow up appointment is carried out in a timely manner. He knew the edema had not responded in months

FIRST AMENDED COMPLAINT - 17
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

prior to the same medication (Furosemide) yet Dr. Grasley doubled the dosage of that medication on August 4, 2021, without scheduling any follow up.

62. Defendant Grasley was the physician and clinical director for Mr. Chung's care, and he was responsible under BOP policy on Patient Care 6031.04 (15) to ensure Mr. Chung was timely and regularly seen and monitored through the chronic care clinic for his Hepatitis C, liver cirrhosis, and resulting complications. Defendant Grasley failed to ensure that appropriate chronic care tracking and follow up was conducted. After Defendant Grasley ordered an ultrasound of Mr. Chung's abdomen to "evaluate for cirrhosis" on January 7, 2020, Defendant Grasley failed to order any follow up to ensure that this ultrasound was performed in a timely manner. Defendant Grasley failed to make sure that the Hepatitis C labs that were ordered on March 9, 2020, were performed in a timely manner.

63. Defendant Megan Heidt is an EMT employed by the BOP. As such, Defendant Heidt had the responsibility under 6031.04 (12)(a)(2) to timely recognize Mr. Chung's condition as an emergency and "request[] an emergency appointment for an inmate during day watch." Witnesses saw Defendant EMT Heidt in the unit as the primary point of contact for Mr. Chung's complaints, repeatedly refusing to take those complaints seriously. This is a failure in the standard of care. Defendants designated EMT Heidt as the primary point of contact for Mr. Chung by having her do rounds in the housing unit and determine emergency access to the medical unit in violation of the standard of care.

64. As Dr. Mark Stern explained in a declaration in *Stirling v. Hendrix,* the BOP and Sheridan were on notice since at least February 1, 2021, that having an EMT make a diagnosis, decide the course of treatment, or be the only and primary point of contact for a patient falls far

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

below the standard of care. Decl. of Dr. Mark Stern, *Stirling v. Hendrix*; Case 3:20-cv-00712-SB; ECF 80-2 , August 27, 2021, at 4.

65. Defendant Grasley as the physician and clinical director for Mr. Chung's care failed to conduct cancer screenings for hepatocellular cancer (liver cancer) which should be done every six months in patients with cirrhosis, and which is required under BOP policy on Patient Care 6031.04 (19)(c). Defendant Grasley also failed to document Mr. Chung's abnormal laboratory result indicating liver cirrhosis, as required under BOP policy on Patient Care 6031.04 (19)(a)(3).

66. All named defendants failed Mr. Chung in adhering to BOP policy on Patient Care 6031.04 (24) by failing to show their "commitment to the principle of preserving and extending life." Under this policy, as well as ethical standards for licensed physicians, health care providers, and nurses, "a seriously ill or dying inmate should be provided care consistent with this goal of preserving and extending life." Defendants were on notice that this was an expectation of their positions as medical providers for Mr. Chung and that failing to treat him, as his only medical providers, could result in his death or a significant shortening of his life, yet Defendants failed to follow this policy time and again.

67. All named defendants failed Mr. Chung and his immediate family members, including Cynthia Benoit and Kailani Chung by failing to in adhere to BOP policy on Patient Care 6031.04 (24)(a) by failing to notify next of kin promptly of Mr. Chung's serious illness.

68. Instead of notifying Mr. Chung's next of kin about his serious illness when he was still alive, the BOP issued a press release following Mr. Chung's death, suggesting that he died of complications resulting to a COVID-19 infection. This was a cover-up and a lie.

69. During his lifetime, Mr. Chung was a loyal and kind friend, son, and father. He regularly kept in touch with his mother, Cynthia Benoit, and his daughter, Kailani Chung. Mr.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

Chung's mother and daughter loved him dearly and Mr. Chung loved them back. The loss of his life has left a gaping hole in the hearts of those who loved him so dearly.

## FIRST CAUSE OF ACTION

### 8th Amendment Delay and Denial of Adequate Medical Care

70. For the purpose of stating the claims below, Plaintiff realleges all previous allegations as if fully set forth herein.

71. Ikaika Chung was a prisoner at the time of his death and was entitled to the protections against cruel and unusual punishment under the 8th Amendment to the United States Constitution. Ikaika Chung was entitled to be free from cruel and unusual punishment pursuant to the 8th Amendment of the United States Constitution. This protection includes a right to adequate and timely medical care and to be protected against preventable harm.

72. The Defendants' repeated failures to provide access to minimally adequate medical care and unacceptable delays in emergent medical treatment amount to deliberate indifference to Mr. Chung's life and well-being and constitute cruel and unusual punishment in violation of the 8th Amendment.

73. The defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that Mr. Chung had a serious medical need – that Mr. Chung had underlying Hepatitis C, progressed liver cirrhosis, and worsening edema. The defendants' inadequate treatment was medically unacceptable under the circumstances and the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health, resulting in his death. The defendants knew of Mr. Chung's serious medical needs and disregarded it by failing to take reasonable measures to address it and the failure to act of the defendant caused harm to the plaintiff.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

## COUNT I

## Denial of Hepatitis C Treatment

## Deliberate Indifference under the 8th Amendment

*Against Defendant Andrew Grasley*

74.     At all relevant times for this complaint, Ikaika Chung had been diagnosed with Hepatitis C. It is clearly established in this jurisdiction and all over the country that Hepatitis C is a serious medical need, and Defendants were on notice of the likelihood of death from untreated Hepatitis C complications. And in fact, while in the care of the BOP and while his Hepatitis C went untreated, Mr. Chung developed liver cirrhosis, edema, a resultant skin infection, and eventually died.

75.     While Mr. Chung was in custody at FCI Sheridan and under the medical treatment of Defendant Doctor Andrew Grasley and his team, Defendant Andrew Grasley acted with deliberate indifference to Mr. Chung's serious medical need by unduly delaying and ultimately denying Hepatitis C treatment for non-medical reasons.

76.     As detailed above, Hepatitis C is curable with an eight or twelve-week oral medication regimen. Mr. Chung's BOP medical records show that he was diagnosed with Hepatitis C in 2007, and while in custody of BOP, Mr. Chung had progressed infection with APRI scores starting at 1.4 in 2018 and ending at 15.5 six months before his death.

77.     Mr. Chung was transferred to Sheridan custody in September of 2019. Yet, Defendant Grasley delayed seeing him for the first time until January 7, 2020. This delay in seeing a chronically ill patient with a progressed APRI score for over three months shows Defendant Grasley's deliberate indifference to Mr. Chung's already emergent serious medical

FIRST AMENDED COMPLAINT - 21
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

need. Defendant Grasley failed to review Mr. Chung's medical records, which indicated that he needed more emergent consideration for Hepatitis C treatment since at least July of 2019.

78. When Defendant Grasley finally saw Mr. Chung on January 7, 2020, he noted that in *July* of 2019 Mr. Chung had an APRI score of 2.42, which is indicative of liver cirrhosis, a complication of untreated Hepatitis C. Defendant Grasley still did not initiate Hepatitis C treatment at this time, further showing deliberate indifference to Mr. Chung's serious medical need. Instead, Defendant Grasley ordered a liver ultrasound that did not occur until 15 months later. Defendant Grasley noted the priority for the ultrasound to be "routine," instead of "urgent," and set a target date of three months out.

79. The ultrasound did not happen for over a year. The ultrasound showed cirrhosis, which is a known complication of chronic untreated Hepatitis. When Defendant Grasley saw Mr. Chung after this ultrasound on April 10, 2021, Defendant Grasley again failed to initiate treatment that would have cured Mr. Chung's infection.

80. Instead of initiating the eight or twelve-week regimen of treatment for the infection on January 7, 2020 or on April 10, 2021, or at any time after Mr. Chung's transfer to Sheridan in September of 2019, Defendant Grasley noted in Mr. Chung's medical chart on August 4, 2021, four months after Mr. Chung's liver ultrasound showed that he had cirrhosis, "he has a drug sanction, almost ready to start treatment."

81. It was Defendant Grasley's responsibility to counsel Mr. Chung about any real or perceived substance use that may interfere with Hepatitis C treatment. It is the physician's responsibility to either offer substance use treatment or refer the patient to available services.

82. BOP Clinical Guidance on treatment for Hepatitis C virus states that the provider should "consider referring to drug education programming and treatment if there is evidence of ongoing substance use." The clinical guidance further states "inmates with evidence for ongoing

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

behaviors associated with high risk of HCV transmission (e.g., injection drug use) are not automatically excluded from consideration for HCV treatment. . .”

83. BOP Clinical Guidance on treatment for Hepatitis C states that an "APRI $\geq$ 2.0 . . . or known or suspected cirrhosis" "may require more urgent consideration for treatment." Defendant Grasley ignored this guidance.

84. Defendant Grasley delayed and ultimately denied Hepatitis C treatment to Mr. Chung until his death from the complications of this curable infection in August of 2021. Hepatitis C treatment would have cured his Hepatitis C infection and likely may have reversed the cirrhosis. Mr. Chung died of complications of cirrhosis before he was ever treated for Hepatitis C. Defendant Grasley's failure to act caused plaintiff harm.

## COUNT II

### Delay of Treatment for Cellulitis

### Deliberate Indifference under the 8th Amendment

*Against Defendants Andrew Grasley and Megan Heidt*

85. In weeks prior to his death, Ikaika Chung should have been under emergent medical care, which required close monitoring and the administration of antibiotics for his conditions. The individual defendants Andrew Grasley and Megan Heidt were deliberately indifferent to Mr. Chung's serious medical needs because they failed to timely and adequately evaluate and treat his cellulitis and ignored its progression to necrotizing fasciitis, until the treatable infection had progressed to septic shock and death resultant from multiple organ failure.

86. For several weeks prior to his death, Mr. Chung's cellulitis had progressed to be severe and caused him to be in pain, required bandaging, and ultimately rendered him unable to ambulate on his own. Other prisoners reported Mr. Chung's cell smelling of rot and death, Mr. Chung having to elevate his leg on multiple pillows, frequently having to change his own

FIRST AMENDED COMPLAINT - 23
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

bandaging, being in severe pain, and Defendant Heidt stopping by Mr. Chung's cell for cell-checks and failing to offer any medical help for Mr. Chung's developing yet preventable emergency.

87. When Mr. Chung's cellulitis had progressed to the point of causing him severe pain, causing his cell to smell like death, and then causing him to be unable to ambulate on his own he had an injury that a reasonable doctor or patient would find important and worthy of comment or treatment because his infection significantly affected Mr. Chung's daily activities and caused him chronic and substantial pain. Yet, Mr. Chung's medical records are silent regarding him having any skin infection until the day of his death.

88. Defendants Grasley and Heidt failed to recognize, diagnose, and initiate any treatment course at all for Mr. Chung's cellulitis. These same individual defendants, despite their duty of care, BOP policies, and obvious need, failed to provide any dressing changes for Mr. Chung's developing infection, further causing complications, and evidencing their deliberate indifference to Mr. Chung's serious medical needs.

89. Defendants failed to diagnose Mr. Chung despite being aware of facts from which the inference could be drawn that a substantial risk of serious harm and a serious medical need existed. Defendants knew that Mr. Chung had severe edema for many months before his death, which is a known risk factor for cellulitis. Medical records show edema worsening in the months prior to his death.

90. Defendant Grasley failed to initiate any follow up treatment plan or place Mr. Chung on the call-out list after Kimberly Cushman, an employee he was in charge of supervising, noted edema and weight gain on June 21, 2021.

91. Defendant Grasley ordered a doubling of Mr. Chung's edema medication on August 4, 2021, and failed to conduct a comprehensive physical exam, despite the prior dose of the same medication failing to be effective and despite Mr. Chung's notable weight gain and

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

increased swelling. Defendant Grasley revealed his deliberate indifference to Mr. Chung's emergent medical need at this visit by failing to conduct a comprehensive physical exam, diagnose the progressed skin infection, failing to initiate antibiotics, coding the problem as "routine," and failing to order any follow-up for this chronically ill patient to see how Mr. Chung would respond to the doubling of medication dosage, given his advanced liver disease.

92.     Ultimately, Defendant Grasley as the medical director of the clinic and the physician in charge of Mr. Chung's care failed to diagnose and treat Mr. Chung's cellulitis – a curable skin infection that required a simple course of oral antibiotics. Defendant Grasley failed to supervise his staff to make sure they were responding to patient complaints, which led to the medical unit's complete failure to even recognize – or perhaps worse, to ignore – the obvious infection until it was much too late.

93.     On the morning of Mr. Chung's death, Defendant Heidt showed her callous and deliberate indifference to Mr. Chung's serious medical need by denying him access to medical care once again and telling him and the other prisoners begging her to help, that "he isn't going to die today."

94.     On the morning of his death, a medical staff finally documented Mr. Chung's skin infection in his medical chart – by this time it had progressed to necrotizing fasciitis. Mr. Chung was feverish, delirious, and his vital signs showed that he was in shock. Despite the urgent need for life-saving medical care, the medical and correctional staff caused a 40-minute delay in emergency personnel having access to Mr. Chung.

95.     As a result of the defendants' deliberate indifference to Mr. Chung's serious medical needs, Mr. Chung died at age forty-two of multiple organ failure hours after finally being transported to the ER.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

96.     As result of the death of Mr. Chung, plaintiffs and his Estate have incurred damages to include funeral expenses and the pain and suffering endured by Mr. Chung as he waited to die.

## SECOND CAUSE OF ACTION

### Professional Negligence and Wrongful Death

*Against the United States of America and Integrated Medical Solutions, LLC/INC*

97.     Plaintiff realleges all previous allegations as if fully set forth herein.

98.     The United States by and through the individual employees and contractors of the Bureau of Prisons had a duty of care to provide safe, sanitary, and secure incarceration for Ikaika Chung. The United States by and through the individual employees and contractors of the Bureau of Prisons had a duty of care to Mr. Chung of timely and appropriate medical care, including being prescribed the proper medications in the proper dosage, regular monitoring of the complications resulting from his known medical conditions, and emergency treatment if his conditions did not respond to a routine course of oral antibiotics. The United States BOP owed a duty of care to Mr. Chung under the laws of the State of Oregon including duties imputed by a special relationship of a doctor and sole healthcare provider to a vulnerable prisoner patient in the Defendants' custody.

99.     The United States contracted with Integrated Medical Solutions to provide healthcare to the prisoners at Sheridan. Integrated Medical Solutions owed a duty of care to Mr. Chung under the laws of the State of Oregon including duties imputed by a special relationship to a vulnerable prisoner in custody and the duty of care of a medical contractor toward its patients.

100.     Upon information and belief, Integrated Medical Solutions hired providers to carry out its contract with the United States, including the individual defendants. The individual defendants were either employees of the United States or of IMS and are sued on alternative

FIRST AMENDED COMPLAINT - 26
(Case No. 3:23-cv-00903-JR)

**LEVI MERRITHEW HORST PC**
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

theories. However, the United States has a nondelegable duty to provide adequate healthcare to its vulnerable prisoners and retains liability for their healthcare.

101. The conduct of the individual employees which violated the professional standards of care for healthcare providers and posed a foreseeable risk to Mr. Chung is fully detailed in the preceding paragraphs, to the best of Plaintiff's knowledge at this time, including:

   a. Defendants failed to timely evaluate and treat Mr. Chung's Hepatitis C;

   b. Defendants, including Defendants Grasley and Heidt, who saw Mr. Chung during this critical time failed to recognize Mr. Chung's serious medical conditions, including failing to note, recognize, measure, document, or timely treat Mr. Chung's worsening skin infection;

   c. The same medical personnel Defendants failed to treat Mr. Chung's serious medical condition in the weeks and months leading up to his death;

   d. Defendant Grasley failed to do a full medical evaluation work-up of Mr. Chung's edema on August 4, 2021, or in days prior or subsequent to that date, failed to recognize Mr. Chung's cellulitis, failed to note Mr. Chung's drastic weight increase due to fluid retention, failed to prescribe antibiotics, and then failed to schedule regular and emergent follow up appointments to determine how Mr. Chung was responding to treatment and to address his emergent, life-threatening medical needs;

   e. Defendant Grasley failed to supervise and train his clinical team to recognize Mr. Chung's developing emergent condition and failed to ensure that his team would appropriately triage and notify him of arising emergencies related to Mr. Chung;

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

f. Defendant Grasley failed to prescribe urgent laboratory testing following the August 4, 2021 appointment;

g. Defendants failed to schedule Mr. Chung for timely outside medical services;

h. Defendants failed to timely transport Mr. Chung to the emergency room;

i. Defendants failed to meet the standard of care by failing to treat Mr. Chung's developing liver cirrhosis, monitor his chronic health conditions, including regular cancer screenings, and administer Hepatitis C medication that would have cured Mr. Chung from his infection and likely resulted in a regular lifespan for Mr. Chung;

j. Defendants failed to provide Mr. Chung with substance abuse treatment and counseling;

k. Defendants failed to provide Mr. Chung with access to medical care after he was unable to ambulate on his own when he developed edema, cellulitis, and necrotizing fasciitis in his legs.

102. As a result of the professional negligence of the defendants, Mr. Chung was not provided with readily available life-saving treatment for his curable cellulitis infection and was not provided with easily administered life-prolonging treatment for his underlying Hepatitis C infection and liver cirrhosis. The defendants' professional negligence directly caused Mr. Chung's untimely death.

103. As a result of the negligence of the defendants and Mr. Chung's untimely death, Cynthia Benoit suffered the loss of care, comfort, companionship and society and loss of consortium of her son and Kailani Chung suffered the loss of care, comfort, companionship and

FIRST AMENDED COMPLAINT - 28
(Case No. 3:23-cv-00903-JR)

society and loss of consortium of her of her father. Mr. Chung suffered disability, pain and suffering leading up to his death. The estate incurred expenses for hospital and burial services rendered for Mr. Chung

## THIRD CAUSE OF ACTION

## Abuse of Vulnerable Person under ORS 124.100

Federal Tort Claim 28 U.S.C.S. § 1346(b)(1)

*Against the United States of America*

104.     Mr. Chung was a vulnerable person because Mr. Chung was unable to ambulate on his own in the weeks leading to his death, became delirious, confused, and eventually went into shock.

105.     Ms. Cynthia Benoit is the personal representative of the estate of Mr. Chung, the decedent. She suffered loss of care, comfort, companionship and society, and loss of consortium as a result of his death.

106.     The individual Defendants employed by the United States of America Bureau of Prisons knowingly acted and failed to act under circumstances in which a reasonable person of their training should have known of the physical abuse:

  a. Namely, the medical team employed by the United States of America was responsible for diagnosing, treating, and responding to Mr. Chung's emergent medical needs;

  b. Defendants failed to recognize and diagnose Mr. Chung's cellulitis infection;

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

c. Defendants failed to treat Mr. Chung's emergent medical needs, including providing sanitary dressing changes and antibiotic treatment to cure the infection;

d. Defendants failed to treat Mr. Chung's cellulitis resulted in Mr. Chung developing necrotizing fasciitis, septic shock, multiple organ failure and his ultimate death.

107. Under these circumstances the Defendants' failure to treat Mr. Chung amounted to physical abuse of a vulnerable person because it constituted criminal mistreatment in the second degree under ORS 163.200:

a. Defendants, having a legal duty to provide medical care for Mr. Chung, who was under Defendants' supervision and custody, withheld medical attention and physical care that resulted in Mr. Chung's death;

b. Defendants acted with criminal negligence when they failed to be aware of a substantial and unjustifiable risk that Mr. Chung's death would result from their failure to treat his progressing skin infection and when they failed to diagnose the worsening conditions altogether, or in the alternative the defendants knew of and consciously disregarded the probability of Mr. Chung's worsening condition and death as a result of their withholding medical treatment.

108. Under this section, Plaintiff seeks economic damages in an amount equal to three times the amount of the cost of the medical treatment Mr. Chung received at Willamette Valley Medical Center and the estate's expenditures on burial and memorial expenses.

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092

109.     Plaintiff further seeks noneconomic damages in an amount equal to three times all noneconomic damages, as defined in ORS 31.705, resulting from Mr. Chung's pain, mental suffering, emotional distress, humiliation, and Ms. Cynthia Benoit's resultant loss of care, comfort, companionship and society, and loss of consortium.

110.     Plaintiff seeks attorney fees and costs under this section.

## PRAYER FOR RELIEF

111.     As a result of the death of Mr. Chung, plaintiffs suffered economic damages of $1,000,000 and non-economic damages of $10,000,000. Plaintiff intends to seek punitive damages against the individual defendants for the *Bivens* claim.

WHEREFORE, plaintiffs pray for relief as follows:

a.      For judgment in favor of plaintiffs against defendants for economic and noneconomic damages for each Constitutional violation and tort in an amount to be proven at trial.

b.      For damages to justly, fairly and reasonably compensate Mr. Chung's child and mother for pecuniary loss and for loss of the society, companionship and services of the decedent under ORS 30.020(2)(d); and

c.      Such costs and damages as the court may deem appropriate.

## JURY DEMAND

Plaintiff hereby demands a jury trial.

**DATED** this 1st day of July, 2024.

s/ Noah Horst
**Noah Horst,** OSB No. 076089
**Sara Long**, OSB No. 224433
Attorneys for Cynthia Benoit

FIRST AMENDED COMPLAINT - 31
(Case No. 3:23-cv-00903-JR)

LEVI MERRITHEW HORST PC
610 SW ALDER ST. SUITE 415
PORTLAND, OR 97205
T: 971.229.1241 | F: 971.544.7092